IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL NO. 11-325-CG |
| FAYAD AZZAM and | ) |
| JULIA CASTRO, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the court on the motion for new trial of the defendants, Fayad Azzam and Julia Castro (hereinafter "Azzam" and "Castro" or "defendants") (Doc. 38-1).  The defendants bring their motion pursuant to Federal Rule of Criminal Procedure 33(b)(2), and argue that there was insufficient evidence to justify their conviction for violation of 18 U.S.C. § 371 and 8 U.S.C. § 1325(c).  For the reasons stated below, the defendants' motion is **DENIED**.

### I.   FACTUAL BACKGROUND

The defendants were indicted on November 23, 2011, on charges of knowingly entering into a marriage for the purpose of evading the immigration laws of the United States, in violation of 8 U.S.C. § 1325(c), as well as conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371.  (See Doc. 1).

The indictment alleged that the defendants were married in Mobile County, Alabama, on December 27, 2010.  Id. at p. 2.  Subsequently, on April 5, 2011,

1

defendant Castro signed and filed a Form I-130, Petition for Alien Relative, with the United States Citizen and Immigration Services ("CIS"), listing defendant Azzam as her husband.  On the same day, Azzam signed and filed a Form G-325, Biographic Information form, stating that his residence since March 2011 was a house on Gayla Court in Mobile, Alabama.  Id.  On the same day, Azzam also signed and filed a Form I-485, Application to Register Permanent Status or Adjust Status, indicating that he was a foreign national.  Id.

After a one-day trial, the jury convicted the defendants on February 7, 2012. (Docs. 34 and 35).  Azzam and Castro now move this court for a new trial, claiming that the verdict by the jury in this case "is shocking to the conscience" and "without any factual or legal support." (Doc. 38-1, p. 15).

## II.   STATEMENT OF THE LAW

A motion for a new trial pursuant to Rule 33 is based on the presumption that the verdict against the defendants is valid; therefore the burden is on the defendants to demonstrate that a new trial ought to be granted.  Wright and Welling, 3 Federal Practice and Procedure, § 581 (4th ed.).

In evaluating a motion for new trial, the court may weigh the evidence, and in so doing, evaluate for itself the credibility of the witnesses.  United States v. Ward, 274 F.3d 1320, 1323 (11th Cir. 2001) (quoting United States v. Kellington, 219 F.3d 1084, 1095 (9th Cir. 2000)).  However, a district court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  United States v. Hernandez, 433 F.3d 1328, 1335 (11th

Cir. 2005).  Rather, a court should only grant a new trial for evidentiary reasons under Rule 33 if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  Id.; see also United States v.. Cox, 995 F.2d 1041, 1044 (11th Cir. 1993) ("[New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great -- not merely the greater -- weight of the evidence.").  "The power to grant a new trial on this ground should be invoked only in exceptional cases, where the evidence weighs heavily against the verdict."  Wright and Welling at § 582.

### III.  LEGAL ANALYSIS

In their motion, Azzam and Castro attempt to "present … additional evidence that not only contradicts the Government's proof at trial, but weighs heavily against the validity of the jury's verdict."  (Doc. 38-1, p. 2).  On this score, the defendants are too late.  It defies common sense that the defendants should be able to present "additional" evidence in a post-conviction motion attacking the validity of the jury's verdict when the jury never had the opportunity to hear or consider such "additional" evidence in the first place.  Moreover, the defense had this evidence in its possession during the trial, but made the strategic decision not to present it and to rest its case after presenting just one witness.  That the defendants believed the government failed to meet its burden, and were ultimately proven wrong, is no reason for this court to now second-guess the jury with the advantages of witness statements and documents that the jury never had an opportunity to consider.

3

Therefore, the only evidence that this court will consider in its review of the defendants' motion is the evidence that was actually presented to the jury at trial.

**(1)   Evidence Presented At Trial**

At trial, the government presented circumstantial evidence that Azzam's and Castro's marriage was a sham. The defendants now assert that this evidence was not sufficient to convict them of the charges listed in the indictment. See Doc. 38-1. The government's evidence included: (1) the testimony of Wilbur Triolet, who was in an on-again, off-again relationship with Castro for the previous eight years, and who had co-habitated with Castro before and during her marriage to Azzam; (2) evidence that Azzam maintained his residence at two apartments before and during his marriage to Castro, including testimony from two leasing agents from Mobile-area apartment complexes who rented units to Azzam; (3) the testimony of DHS agent Chris Anderson, who testified about surveillance he conducted upon Azzam's apartment, about his investigation into Azzam's and Castro's utility bills, and about the immigration forms that Azzam and Castro submitted to the CIS; (4) the testimony of Michael Fillers, the property manager of a Mobile-area house that Triolet and Castro rented together in March of 2011; and (5) the testimony of LaSonya Toney, an employee of the University of South Alabama ("USA") who testified that Azzam was required to leave the mechanical engineering graduate program he had been enrolled in because of poor academic performance.

The defense presented circumstantial evidence that Azzam and Castro's marriage was not a sham. This defense evidence consisted of the testimony of

4

Castro's ten year-old daughter, Destiny Meijas, who testified that Azzam lived with Castro for a brief time after the two were married.

**(a)     Testimony of Wilbur Triolet**

Triolet's testimony can be summarized thusly: he and Castro were in a romantic relationship together when they moved (along with Castro's children) from Miami, Florida, to Mobile, Alabama, in approximately 2005. Having moved their household around greater Mobile numerous times over the years, Triolet and Castro found themselves living together at a residence located on Noble Lane in Tillman's Corner, Alabama. In November 2010, they ended their relationship and Triolet moved out of the house.

Approximately one month after breaking up with Triolet, Castro married Azzam on December 27, 2010. (Doc. 1, p. 1). Triolet testified that he and Castro resumed their cohabitation in March 2011 after signing a one-year lease agreement for a home at Gayla Court in Mobile, although Triolet stated that he was unaware of Castro's marriage to Azzam. Approximately one month after moving to Gayla Court, Triolet discovered that Castro had married Azzam, and once again ended their relationship in April 2011. Triolet subsequently moved out of the Gayla Court house.

**(b)     Evidence of Azzam's Separate Residences**

The government presented evidence that Azzam lived apart from Castro in the months before and after they were married. Shiloe Wiegers, a leasing agent at the Windsor Place apartment complex in Mobile, testified that Azzam rented a one-

bedroom apartment at Windsor Place for one year, from August 2010 to August 2011. When Azzam's lease at Windsor Place ended, he rented a new apartment at the Inverness Lakes apartment complex on Cottage Hill Road in Mobile. Kristen Thompson, a leasing agent at the Inverness Lakes apartment complex, testified that: (1) Azzam signed a lease for a one-bedroom "loft" on September 23, 2011; (2) Castro's name was on the lease, although Azzam was alone when he filled out the paperwork for the apartment; (3) Azzam listed his Windsor Place apartment as Castro's previous address rather than her Gayla Court address; (4) a one-bedroom "loft" apartment such as the one Azzam and Castro rented could be occupied by two adults at most, but was not suitable for additional residents, including children; and (5) as of January 2012, Azzam was still paying rent on the apartment.

      **(c)**     **Testimony of DHS Agent Christopher Anderson**

DHS agent Christopher Anderson testified about the particulars of the investigation he conducted into Azzam's immigration status and residency in Mobile, which began in June 2011. Specifically, Anderson testified that Azzam is a Palestinian national who travels with a Lebanese passport, and who lawfully entered the United States on a student visa which permitted him to stay in the United States while he was enrolled as a student. Anderson also testified that he concluded that Azzam and Castro were living in separate residences based upon (1) his surveillance of Azzam's Windsor Place apartment and the house at Gayla Court, and (2) his investigation of utility bills for Azzam's apartment units and the house at Gayla Court.

Anderson also testified as to paperwork that Azzam and Castro submitted to the United States Customs and Immigration Services. This paperwork included, among other documents, Azzam's Form I-485, Application to Register Permanent Residence or Adjust Status (Government's Exhibit 12); Castro's I-864, Affidavit of Support (Government's Exhibit 13); Castro's I-130 Petition for Alien Relative (Government's Exhibit 14); and Castro's G-325, Biographic Information form (Government's Exhibit 15). Anderson testified that the Form I-485 was signed by Azzam and indicated that he was married; listed Castro as his spouse; and listed Gayla Court as his address. Anderson noted that the Form I-485 contains the statement that "I can read and understand English, and I have read and understand each and every question and instruction on this form, as well as my answer to each question," beneath which Azzam signed his name under the penalties of perjury.

Anderson also testified that the I-130 Petition, which was signed by Castro, indicated that she and Azzam were husband and wife, and listed Gayla Court has the address where Azzam and Castro lived together since March 2011. Additionally, Anderson testified that the G-325 form was signed by Castro, listed Azzam has her current spouse, and indicated that Azzam had lived at Gayla Court since March 2011.

    **(d)    The Government's Other Circumstantial Evidence**

The government presented the testimony of Michael Fillers, who acted as the property manager of the Gayla Court house on behalf its owner, Owen McDonald,

Jr. Fillers testified that he rented the house to Castro and Triolet on a one-year lease beginning in March 2011, with an option to purchase the house.

The government also presented the testimony of LaSonya Toney, an employee at USA who testified that Azzam was admitted to USA's graduate mechanical engineering program in 2009 in order to pursue a master's degree. Toney also identified Azzam's Form I-20, Certificate of Eligibility for Nonimmigrant (F-1) Student, which is an immigration form required for foreign students living in the United States (Government's Exhibit 1). At the bottom of the form, Azzam signed a statement which read, in part, "I certify that I seek to enter or remain in the United States temporarily, and solely for the purpose of pursuing a full course of study…" Toney also identified two letters from USA, dated May 2011 and addressed to Azzam, informing him of his dismissal from USA's graduate school because of his poor Spring Semester 2011 grades (Government's Exhibits 2 and 3). The first letter, dated May 18, 2011, from Dean Keith Harrison, indicates that Azzam had been on academic probation since the end of the Spring Semester of 2010.

### (e)   Testimony of Destiny Meijas

Castro's 10 year-old daughter, Destiny Meijas testified that Azzam and Castro had dated for a period of time before getting married in December 2010, although she had difficulty remembering when Castro and Triolet broke up. Meijas further testified that Azzam had moved into the house on Noble Lane after Castro's and Triolet's relationship ended. Meijas then stated that Azzam subsequently

moved out before Triolet returned to Noble Lane, whereupon Castro and Triolet rented a house on Gayla Court in Mobile. <u>Id.</u> at p. 166-167. Meijas also stated that Triolet slept on the couch in the living room when he returned to the Noble Lane house as well as at Gayla Court before he moved out several months later. <u>Id.</u> at p. 167.

**(2)  The Defendants' Argument**

    **(a)  Proof of Cohabitation and Multiple Residences**

Azzam and Castro assert that the evidence of their cohabitation was "uncontroverted." (Doc. 38-1, p. 3). Yet at trial they relied exclusively on the testimony of Meijas to establish that Azzam and Castro dated before they married in December 2010, and to establish that Azzam lived with Castro after the marriage.[1] Thus, the sole witness to testify before the jury about the bona fides of the defendants' marital relationship was the co-defendant's young daughter.[2] Insofar as the court may weigh Meijas' testimony and evaluate her credibility for itself, it is inclined to discount her statements, owing both to her age and to the enormous pressure placed upon her in testifying at her mother's criminal trial. The jury could reasonably have done the same. The court even instructed the jury that

---

[1] The defendants also seek to make more of Meijas' testimony than she actually said. For example, the defendants' brief states that "[t]he uncontroverted testimony at trial from Destiny Meijas was that the couple lived together, then due to problems associated with her brother's adjustment to the marriage, Fayad and Julia would live apart at times and together at times." (Doc. 38-1, p. 7). The court's recollection is that Meijas simply did not testify in such detail.

[2] As explained more fully, <u>supra,</u> the court will not consider the unsworn statement of Sultan Saeed because the defendants did not to call Saeed as a witness at trial. Therefore, the jury did not have the opportunity to hear or consider his testimony.

9

"[t]o decide whether you believe any witness, I suggest you ask yourself a few questions …[d]id the witness have any particular reason not to tell the truth?"

The defendants also assert, without citation to the record, that "the evidence was clear that the couple resided together for a period after their marriage." (Doc. 38-1, p. 4). However, based upon the evidence presented at trial, the jury could reasonably have found that Azzam and Castro did not live together after their marriage in December 2010. The government presented ample evidence that Azzam leased one-bedroom apartments that were unsuitable for a family with children, from August 2010 through the present. This evidence included Department of Homeland Security surveillance of Azzam's Windsor Place apartment, which indicated that Azzam came and went from the unit while Castro was seen there on only one occasion for approximately fifteen minutes. Furthermore, the testimony of Michael Fillers revealed that in March of 2011, Castro and Triolet signed a lease agreement together to rent the house at Gayla Court with an option to purchase the house. The jury could reasonably have concluded that this was not behavior consistent with someone who had recently married Azzam.

In contrast to this evidence, defense counsel established on cross-examination that Azzam frequently listed Castro's Gayla Court address as his residence (a fact recited in the indictment), and that Castro's name was on the Inverness Lakes apartment lease. While these facts could conceivably have muddied the water

somewhat for the jury, they do not weigh so heavily upon the record that it was unreasonable to conclude that Azzam and Castro lived separately.

**(2)     Fraudulent Immigration Paperwork**

The defendants characterize the government's case at trial as placing a great deal of importance upon errors contained in the immigration forms filed by Azzam and Castro, and point out that the multitude of errors in the immigration forms were actually the fault of Azzam's immigration lawyer, who filled out the paperwork months after the marriage.  (Doc. 38-1. p. 11).  The defendants argue further that "none of these mistakes bear any enlightment [sic] on the couple's state of mind at the time of marriage." Id.

The government did place emphasis on this point, questioning DHS agent Anderson about the number of dependents that Castro reported in her I-864, Affidavit of Support, and argued at closing that Castro lied when she listed only two of her four children on the form.  However, the court is skeptical of the argument that any and all errors contained in these forms must be laid exclusively at the feet of Azzam's immigration counsel, with no bearing at all on the defendants' state of mind.  Azzam and Castro both signed certifications stating that they read and understood the answers given on each form.  This court cannot say that it was unreasonable for the jury to attach weight to that fact.  Furthermore, the immigration paperwork was not presented to the jury in a vacuum, and the government also presented circumstantial evidence that Castro and Azzam lived

separately, and that Azzam's year-long academic probation had jeopardized his immigration status long before he applied for permanent residency. A post-trial argument that the defendants didn't really mean what they certified to be accurate and truthful in their immigration forms does not merit throwing out the jury's verdict as a miscarriage of justice.

### (3)  Insufficient Evidence to Find Marriage Fraud

Finally, the defendants assert that "[t]he overwhelming indication of all evidence presented in this case, both at trial and in this motion for new trial is that the parties are married, they married with an intent to establish a life together and although they have struggled with separations, issues combining families and parenting struggles, they have an ongoing commitment to each other and their life together." (Doc. 38-1, p. 12). The defendants argue further that the government did not meet its burden of proof that the parties had an intent to defraud at the time of their marriage. Id. at p. 13.

As specified in greater detail above, the court is unpersuaded by the "additional" evidence catalogued in the defendants' motion for new trial. The defendants must rise or fall based on their strategic decisions at trial, and where they purposefully chose not to introduce evidence and rest their case, the court will not now reverse the jury's verdict because the defense has had a change of heart. The only evidence heard by the jury as to genuineness of Azzam's and Castro's relationship was the testimony of Castro's young daughter, who faced seeing her mother convicted on federal criminal charges. Weighing against her testimony, on

the other hand, was the evidence of Castro's and Azzam's separate residences, Castro's and Triolet's relationship, Castro's and Triolet's signing a rental agreement on a house with an option to purchase, and Azzam's year-long academic probation which jeopardized his student visa and subsequently resulted in his dismissal from USA.  A reasonable jury could reasonably have discounted the testimony of Destiny Meijas and found that the remaining evidence before them was sufficient to convict the defendants.

The court does not find that the jury's verdict was "shocking to the conscience," and finds that said verdict has factual and legal support.  This is not one of the exceptional cases in which a new trial is appropriate, and accordingly, the defendants' motion for new trial is **DENIED.**

**DONE** and **ORDERED** this 1st day of March 2012.

                                                /s/  Callie V. S. Granade
                                      **UNITED STATES DISTRICT JUDGE**